UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

*In re:*

*FORD FUSION AND C-MAX FUEL ECONOMY
LITIGATION*

This Document Relates to All Actions

No. 13-MD-2450 (KMK)

OPINION & ORDER

Appearances:

Paul Geller, Esq.
Stuart A. Davidson, Esq.
Mark Dearman, Esq.
Sheri Coverman, Esq.
Robbins Geller Rudman & Dowd LLP
Boca Raton, FL
*Co-Lead Counsel for Plaintiffs and the Class*

Samuel H. Rudman, Esq.
Robbins Geller Rudman & Dowd LLP
Melville, NY
*Co-Lead Counsel for Plaintiffs and the Class*

Rachel L. Jensen, Esq.
Robbins Geller Rudman & Dowd LLP
San Diego, CA
*Co-Lead Counsel for Plaintiffs and the Class*

Eric H. Gibbs, Esq.
Geoffrey A. Munroe, Esq.
David K. Stein, Esq.
Girard Gibbs LLP
San Francisco, CA
*Co-Lead Counsel for Plaintiffs and the Class*

John A. Yanchunis, Esq.
Rachel L. Soffin, Esq.
Morgan & Morgan, P.C.
Tampa, FL
*Counsel for Plaintiffs' Executive Committee*

Peter G. Safirstein, Esq.
Morgan & Morgan, P.C.
New York, NY
*Counsel for Plaintiffs' Executive Committee*

Richard D. McCune, Esq.
Elaine S. Kusel, Esq.
McCune Wright, LLP
Redlands, CA
*Counsel for Plaintiffs' Executive Committee*

Scott A. George, Esq.
Seeger Weiss, LLP
New York, NY
*Counsel for Plaintiffs' Executive Committee*

Stephen R. Jaffe, Esq.
Mark Fistos, Esq.
Seth Lehrman, Esq.
Farmer, Jaffe, Weissing, Edwards, Fistos & Lehrman, P.L.
Fort Lauderdale, FL
*Counsel for Plaintiffs' Executive Committee*

Bruce W. Steckler, Esq.
Mazin Sbaiti, Esq.
Steckler Law LLP
Dallas, TX
*Counsel for Plaintiffs' Executive Committee*

Michael A. Caddell, Esq.
Cynthia B. Chapman, Esq.
Cory S. Fein, Esq.
Caddell & Chapman
Houston, TX
*Counsel for Plaintiffs' Executive Committee*

Joel A. Dewey, Esq.
Jeffrey M. Yeatman, Esq.
Matthew A. Goldberg, Esq.
Timothy H. Birnbaum, Esq.
DLA Piper LLP
New York, NY
*Counsel for Defendant*

John M. Thomas, Esq.
Dykema Gossett PLLC
Ann Arbor, MI
*Counsel for Defendant*

Peter J. Fazio, Esq.
Aaronson Rappaport Feinstein & Deutsch, LLP
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

Plaintiffs are consumers who purchased or leased a 2013 Ford Fusion Hybrid ("Fusion") or 2013 Ford C-MAX ("C-MAX," and collectively, the "Vehicles") from dealerships licensed by Ford Motor Company ("Ford," or "Defendant"), an automobile manufacturer based in Dearborn, Michigan, allegedly in reliance on Ford's "misrepresentations and material omissions" about the Vehicles' fuel economy.  (Consolidated Second Am. Class Action Compl. ("SAC") ¶¶ 7–9, 35 (Dkt. No. 84).)  Plaintiffs bring this Consolidated Second Amended Class Action Complaint ("SAC") on their own behalf and on behalf of members of a putative class ("Class"), alleging that they would not have otherwise purchased or leased the Vehicles, or would not have paid as much for them, had it not been for Defendant's misrepresentations, and that they have otherwise been damaged because of higher fuel costs and the diminution in the Vehicles' value.  (*See id.* ¶ 8.)  Before the Court is Defendant's second Motion To Dismiss this Action pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion").  The Court granted in part and denied in part Defendant's first motion in a prior Opinion & Order, and granted Plaintiffs leave to amend certain claims asserted in the Consolidated Amended Class Action Complaint.  *See In re Ford Fusion & C-MAX Fuel Economy Litig.*, No. 13-MD-2450, 2015 WL 7018369 (S.D.N.Y. Nov.

12, 2015) ("*Ford I*").[1]  For the reasons stated herein, Defendant's Motion To Dismiss is granted in part and denied in part.

## I.  Background

### A.  Factual Background

The following facts are drawn from the SAC, and they are assumed to be true for purposes of deciding Defendant's Motion.  Because this is Defendant's second Motion To Dismiss, the Court assumes the Parties' familiarity with many of the allegations asserted in the SAC.  What follows is a condensed recitation of Plaintiffs' allegations, with a specific focus on any new additions contained in the SAC.

#### 1.  Ford's Advertising Campaign

In 2013, Ford "launched a massive," and allegedly misleading, advertising campaign focusing on two of its new hybrid models—the Fusion and the C-MAX, highlighting that the Vehicles delivered 47 city, 47 highway, and 47 miles per gallon ("MPG") combined.  (SAC ¶ 3.) Ultimately, the campaign was a "tremendous success" and contributed to "record hybrid sales," allegedly attributable to the Vehicles' fuel economy.  (*Id.* ¶ 4.)  By the end of 2012, Ford had increased its share of the hybrid market to 16%, up from 3% as of mid-2012, and by April 2013, Ford was the "second-leading auto company in the hybrid market," with record hybrid sales continuing through August 2013.  (*Id.*)

The problem, Plaintiffs contend, is that Ford's advertising campaign was "highly misleading."  (*Id.* ¶ 5.)  Plaintiffs allege that the campaign "emphasized that the '47 MPG' was something the Vehicles would actually deliver," (*id.* ¶ 53), and conveyed "the overall impression

---

[1] Specifically, the Court gave Plaintiffs "30 days to amend the [Consolidated Amended Class Action Complaint] *only to specifically allege the advertisements that each of the[] Plaintiffs relied upon*."  *Ford I*, 2015 WL 7018369, at *40.

that Ford's 2013 Fusion Hybrid and C-MAX did, in fact, deliver . . . 47 MPG . . . under real[-]

world driving conditions," (*id.* ¶ 62).  However, "[o]utside of the laboratory, under real-world

driving conditions, consumers who purchased a 2013 Fusion Hybrid or C-MAX [H]ybrid found

themselves consistently unable to get anywhere near the advertised 47 MPG."  (*Id.* ¶ 5.)  "Some

of Ford's advertisements include[d] small type at the bottom that read[], 'EPA-estimated 47

city/47 hwy/47 combined [MPG].  Actual mileage may vary,'" but Plaintiffs contend that this

"standard boilerplate language . . . did not alter the campaign's overall impression on

consumers," (*id.* ¶ 56), in part because "nowhere in the [advertising] campaign did [Ford] make a

distinction between real-world performance and the EPA-estimated rating," (*id.* ¶ 57).[2]

      Plaintiffs maintain that the offending representations included:

- "The Ford Fusion Hybrid delivers a remarkable 47 mpg city and highway[.]"
- "The Ford Fusion delivers a U.S. EPA-certified 47 mpg city, 47 mpg highway[,] and 47 mpg combined in its hybrid model!"
- "47 mpg in the city and on the highway?  Yes, it's true.  The all new Fusion Hybrid achieves 47 combined mpg—doubling the fuel economy of the average vehicle."
- "Fusion Hybrid gets 47 MPG in the city, on the highway[,] and combined."
- "C-MAX Hybrid is Ford's first hybrid vehicle to offer 47 mpg across the board."
- "C-MAX Hybrid delivers EPA-certified 47 mpg city, 47 mpg highway ratings—7 mpg better than the Toyota Prius [V] on the highway—for a 47 mpg combined rating."
- "47 mpg hybrid for me."

(*Id.* (emphasis and internal quotation marks omitted).)  Plaintiffs also allege that several

advertisements compared the Fusion and C-MAX to other hybrid cars available for sale.  These

advertisements include the following:

- An advertisement indicating that the Fusion "tops the Toyota Camry Hybrid by 8 mpg highway and 4 mpg city, and delivers the highest-ever fuel economy

---

      [2] Plaintiffs fail, however, to identify any advertisement that did not include the disclaimer.

numbers in city and highway driving for a midsize sedan." (*Id.* ¶ 64 (internal quotation marks omitted).)

- An advertisement entitled "Wrong Direction" in which the narrator indicated that the Fusion was "the most fuel efficient midsize sedan in America." (*Id.* ¶ 65 (emphasis and internal quotation marks omitted).)
- An advertisement entitled "New Idea" which claimed that the "Fusion doubles the fuel economy of the average vehicle." (*Id.* ¶ 66 (internal quotation marks omitted).)
- An advertisement indicating that the C-MAX "beats Prius V with better mpg" and is "Miles Per Gallon Ahead of the Competition." (*Id.* ¶ 67 (internal quotation marks omitted).)

The advertising campaign targeted the Toyota Prius V in particular, which "provided space comparable to Ford's 2012 Fusion Hybrid, but was advertised as achieving 44 MPG city, 40 MPG highway, for a combined 42 MPG." (*Id.* ¶¶ 45, 68.)  Plaintiffs allege that, in its advertisements, Ford "regularly compared the mileage of the C-MAX to that of the Toyota Prius." (*Id.* ¶ 68.)  The theme of these advertisements was that the C-MAX delivered better MPG than the Prius V.  (*See, e.g.*, *id.* ¶¶ 67, 69.)  Plaintiffs allege that these comparisons were false or misleading because "the Prius actually achieves better MPG than the C-MAX in real-world driving conditions."  (*Id.* ¶ 79.)

Plaintiffs have specifically identified seven advertisements that they claim exemplify the false and misleading statements Ford made during the advertising campaign.

### a.  Exhibit 1: Freight

The "Freight" commercial begins as a cartoon, with a driver loading and getting into a C-MAX, starting it up, and driving past a second cartoon car, which the commercial implies is a Prius V.  As the C-MAX passes the Prius V, the commercial's narrator states: "C-MAX also beats Prius V with better MPG."  The cartoon C-MAX then morphs into a real-world C-Max and the narrator instructs viewers to "say hi to the 47 combined MPG C-MAX Hybrid."  At the end of the commercial, a chyron stating "47 Combined MPG | Ford C-MAX Hybrid" appears above

the C-MAX, and the disclaimer "EPA-Estimated 47 city/47 hwy/47 combined mpg. Actual mileage will vary," appears below the vehicle.

### b.  Exhibit 2: Weeee

The "Weeee" commercial begins as a cartoon, with multiple vehicles driving past a vehicle that the commercial implies is a hybrid. After the other vehicles pass the hybrid, the commercial's narrator comments that most hybrids "are just no fun to drive." As the narrator says, "Here's one that will make you feel alive. Meet the five passenger Ford C-MAX Hybrid," a hand appears and draws the outline of a C-MAX. A cartoon character then gets into the C-MAX and drives past a series of cartoon vehicles. As this is occurring, the narrator states, "C-MAX says ha, C-MAX says weeee, which is what you get, don't you see because C-MAX has lots more horsepower than Prius V, a hybrid that C-MAX also bests in MPG. Say hi to the 47 combined MPG C-MAX Hybrid." While the narrator is making this statement, the cartoon C-MAX morphs into a real-world C-MAX, which is then shown driving around on city streets. As the narrator gets to the point in the commercial where he states that the C-MAX "bests" the Prius V in MPG, text appears at the bottom of the screen stating: "EPA-estimated 47 city/47 hwy/47 combined mpg. Actual mileage will vary." At the very end of the commercial, a chyron appears, which states, "47 combined MPG | Ford C-MAX Hybrid."

### c.  Exhibit 3: Hybrid Games

In the internet advertisement entitled "The Hybrid Games" two actors portray reporters trying to determine whether the C-MAX or Prius V delivers better MPG. The reporters comment on the C-MAX and Prius V while two individuals are shown driving a C-MAX and a Prius around Los Angeles on various errands. Approximately 25 seconds into the commercial, the reporters compare the "specs" of the vehicles. One reporter states, "According to the specs, the

C-MAX Hybrid delivers higher MPG than Prius V." A chyron displays that the C-MAX gets 47

MPG in the city and on the highway, while the Prius V gets 44 MPG in the city and 40 MPG on

the highway. As all of this is occurring, a disclaimer appears at the bottom of the screen stating:

"EPA-estimated. Actual mileage may vary." The next fuel economy related comparison occurs

approximately one minute into the commercial. Two chyrons appear on the screen depicting the

"total range" of the vehicles. The chyrons state that the C-MAX has a total range of 571 miles,

while the Prius V has a total range of 450 miles. One of the reporters states, "Total range of the

C-MAX Hybrid is 571 miles, so the C-MAX Hybrid should go farther on a tank of fuel." A

disclaimer at the bottom of the screen notes that these figures are "[b]ased on fueleconomy.gov."

As the commercial continues, the C-MAX and Prius are shown making various stops throughout

Los Angeles. As the commercial nears its conclusion, the Prius is shown pulling into a gas

station and fueling up. A chyron then declares the C-MAX the winner of the competition.

Before the ad ends, two chyrons reiterate that the C-MAX delivers 47 MPG and has a total range

of 571 miles. One reporter finally concludes that the C-MAX has "more power, torque, and

better MPG." No disclaimer appears along with these chyrons or statements.

### d. Exhibit 4: The Fusion Brochure

The Fusion Brochure is a 16-page print brochure and spec sheet given to certain Plaintiffs

before they purchased a Fusion. The most pertinent part of the brochure states:

> 47 mpg in the city and on the highway? Yes, it's true. Building upon the award-
> winning success of the 2012 model, the all-new 2013 Fusion Hybrid achieves 47
> combined mpg.[1] City mileage is best in class and 4 mpg more than its nearest class
> competitor.

(SAC Ex. 4, at 5.) The footnote referenced in this section states: "EPA-estimated 47 city/47

hwy/47 combined mpg." (*Id.* at 5 n.1.)

### e.  Exhibit 5: Fusion Hybrid Video

The Fusion Hybrid Video is similar to the other commercials discussed above in that it shows a Fusion Hybrid driving around on city streets and highways.  Approximately 20 seconds into the commercial, the narrator states: "With a turbo-charged EcoBoost engine and a hybrid that doubles the fuel economy of the average vehicle, it's an entirely new idea of what a car can be."  As the narrator is speaking, a disclaimer appears at the bottom of the screen.  It states: "EcoBoost Optional.  EPA-estimated 47 city/47 hwy/47 combined mpg.  Actual mileage will vary.  Based on a comparison of US EPA's estimated combined fuel economy of Fusion Hybrid (47 mpg) and US Federal Highway Admin. 2010 estimate of average fuel economy of all light duty vehicles (21.6 mpg)."

### f.  Exhibit 6: The C-MAX Brochure

The C-MAX Brochure is a 10-page print brochure and spec sheet distributed to certain Plaintiffs before they purchased or leased a C-MAX.  The most pertinent part of the brochure states:

## The all-new C-MAX Hybrid:
## Reduced carbon footprint.  Real-car performance.

Introducing the versatile new 5-passenger multi-activity vehicle from Ford: C-MAX Hybrid.  With up to 47 city and 47 hwy mpg.[1]  It's more fuel efficient than Toyota Prius [V].  And that's only the beginning.  When you step on the accelerator, C-MAX Hybrid delivers a truly engaging driving experience.

(SAC Ex. 6, at 2.)  The footnote referenced in this passage states: "EPA-estimated 47 city/47 hwy/47 combined mpg."  (*Id.* at 2 n.1.)

### g.  Exhibit 7: Wrong Direction

The "Wrong Direction" commercial shows a Fusion weaving in and out of traffic.  All of the other cars depicted in the commercial are driving in reverse, while the Fusion drives forward.

As the Fusion speeds by the cars going in reverse, the narrator states, "While everyone else seems headed in the wrong direction, Ford is not just going forward, it's going further.  The 2013 Ford Fusion: the most fuel efficient midsize hybrid sedan in America."  As the narrator makes these representations, a disclaimer appears at the bottom of the screen.  It states: "EPA-estimated rating of 47 city/47 hwy/47 combined mpg.  Actual mileage will vary."

2.  Consumer Complaints and Subsequent Action

Shortly after the Fusion and C-MAX were made available for sale, Plaintiffs allege that "buyers began complaining in droves about the low gas mileage they were able to achieve," with many "report[ing] an inability to even reach MPG in the high 30s," never mind fuel economy that "'beats' Toyota's Prius."  (SAC ¶ 83.)  Plaintiffs also allege that subsequent independent testing has confirmed that the Vehicles do not achieve the advertised 47 MPG.  (*See id.* ¶ 84.)

Importantly, Plaintiffs contend that Ford knew that the Vehicles did not achieve 47 MPG in real-world conditions, and acknowledged as much near the end of the 2013 model year.  (*See id.* ¶ 5.)  Specifically, Plaintiffs allege that Ford "would have known" because "Ford and other automakers do field testing where a number of vehicles are subject to extensive real-world driving and the resulting data—which includes actual gas mileage—is recorded and analyzed." (*Id.* ¶ 88.)  Plaintiffs further allege that Ford implicitly recognized that its advertising campaign was misleading, by "offering 2013 Fusion Hybrid and C-MAX [H]ybrid owners a software upgrade to improve their fuel economy," even as "consumers continue[d] to report average mileage well below 47 MPG," and without disclosing any possible "performance trade-offs associated with the upgrade," (*id.* ¶ 91), and that Ford also "lowered the estimated MPG for the C-MAX, from 47/47/47 to 45 city, 40 hwy, for a combined 43 MPG," (*id.* ¶ 92).  Plaintiffs also aver that Ford announced that it derived the MPG figures for the C-MAX based "solely on the

testing of the 2013 Fusion Hybrid, although the [Fusion] is smaller and has a more aerodynamic shape." (*Id.* ¶ 6; *see also id.* ¶ 93.) As a result, Plaintiffs allege that "Ford is . . . now offering 'good will' payments to C-MAX owners and lessees," namely "partial compensation . . . as reimbursement for . . . increased fuel costs." (*Id.* ¶ 96.)

### 3.  Experience of Each Plaintiff

In the SAC, Plaintiffs provide background on each of the named Plaintiffs. While Defendant's Motion focuses on the allegations in the SAC as a whole, the Court briefly summarizes the experiences of each Plaintiff, grouped by state and by vehicle. Plaintiffs allege that the represented fuel economy of the Vehicles played a pivotal role in Plaintiffs' purchasing decisions. (*Id.* ¶¶ 13–34, 36–40.)

### a.  Fusion

Johanna Fontenot, of Altadena, California, purchased a Fusion in November 2012 in reliance on the Fusion Brochure and the Fusion Hybrid Video. (*Id.* ¶ 16 & nn.6–7.)

Dean Wilkins, of Holyoke, Colorado, purchased a Fusion in November 2012 in reliance on the Fusion Brochure. (*Id.* ¶ 17 & n.8.)

Jeremy Dobbs, of Orlando, Florida, purchased a Fusion in December 2013 in reliance on the Fusion Brochure and the Fusion Hybrid Video. (*Id.* ¶ 19 & nn.11–12.)

Richard Weglarz, of Antioch, Illinois, purchased a Fusion in November 2012 in reliance on the Fusion Brochure and the "Wrong Direction" commercial. (*Id.* ¶ 22 nn.17–18.)

Matthew Romak, of Gibraltar, Michigan, purchased a Fusion in January 2013 in reliance on the Fusion Brochure and the Fusion Hybrid Video. (*Id.* ¶ 25 & nn.21–22.)

Dean Majkrzak, a current resident of Phoenix, Arizona, purchased a Fusion in January 2013 in New Brighton, Minnesota in reliance on the Fusion Brochure and the Fusion Hybrid Video.  (*Id.* ¶ 26 & nn.23–24.)

Michael Hendrickson, of Rogersville, Missouri, purchased a Fusion in January 2013 in reliance on the Fusion Brochure.  (*Id.* ¶ 28 & n.27.)

Mark Goodale, of Beaverton, Oregon, purchased a Fusion in January 2013 in reliance on the Fusion Brochure, Fusion Hybrid Video, and "Wrong Direction" commercial.  (*Id.* ¶ 32 & nn.31–33.)

Gary Druckenmiller, of Lewistown, Pennsylvania, purchased a Fusion in December 2012 in reliance on the Fusion Brochure.  (*Id.* ¶ 33 & n.34.)

### b.  C-MAX

Gregory Holman, of Phoenix, Arizona, purchased a C-MAX in December 2012 in reliance on the "Freight" commercial and the "Hybrid Games" video.  (*Id.* ¶ 13 & nn.2–3.)

Bruce Klafter, of San Mateo, California, purchased a C-MAX in November 2012 in reliance on the "Weeee" commercial.  (*Id.* ¶ 14 & n.4.)  Richard Pitkin, of Roseville, California, purchased a C-MAX in October 2012 in reliance on the "Hybrid Games" video.  (*Id.* ¶ 15 & n.5.)

April Tibbetts, of Terryville, Connecticut, purchased a C-MAX in November 2012 in reliance on the "Freight" commercial and the C-MAX Brochure.  (*Id.* ¶ 18 & nn.9–10.)

James Oldcorn, of Naples, Florida, purchased a C-MAX in December 2012 in reliance on the "Freight" commercial.  (*Id.* ¶ 20 & n.13.)

Gary Cole, of Wakarusa, Indiana, purchased a C-MAX in January 2013 in reliance on the "Freight" commercial, "Weeee" commercial, and C-MAX Brochure.  (*Id.* ¶ 21 & nn.14–16.)

Raymond Belden, of Odenton, Maryland, purchased a C-MAX in January 2013 in reliance on the "Freight" commercial.  (*Id.* ¶ 23 & n.19.)

James Griffiths, of Bay City, Michigan, purchased a C-MAX in September 2012 in reliance on the C-MAX Brochure.  (*Id.* ¶ 24 & n.20.)

Leah Broome, of Rolla, Missouri, purchased a C-MAX in December 2012 in reliance on the "Freight" commercial and the "Hybrid Games" video.  (*Id.* ¶ 27 & nn.25–26.)

James DeVito, of Brewster, New York, purchased a C-MAX in December 2012 in reliance on the "Freight" commercial.  (*Id.* ¶ 29 & n.28.)  Robert Fellows, of Valley Cottage, New York, leased a C-MAX in October 2012 in reliance on the "Freight" commercial.  (*Id.* ¶ 30 & n.29.)  Octavio Hoyos, of Howard Beach, New York, purchased a C-MAX in December 2012 in reliance on the "Freight" commercial.  (*Id.* ¶ 31 & n.30.)

Dennis Harkins, of Fitchburg, Wisconsin, purchased a C-MAX in November 2012 in reliance on the "Hybrid Games" video.  (*Id.* ¶ 34 & n.35.)

### 4.  Regulatory Context

As Defendant explained in connection with its first Motion To Dismiss, "[t]he testing and disclosure of estimated fuel economy for new vehicles sold in the United States is governed by a comprehensive federal regulatory scheme" created by the Environmental Policy and Conservation Act ("EPCA"), and enforced by the Federal Trade Commission ("FTC") and Environmental Protection Agency ("EPA").  (Def.'s Mem. of Law in Supp. of First Mot. To Dismiss 4 (Dkt. No. 64).)  In 1975, Congress passed the EPCA with the intent of improving motor vehicle energy efficiency.  *See Green Mtn. Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 305–07 (D. Vt. 2007).  It provides that every new vehicle sold in the United States be labeled with a sticker (a "Monroney Sticker") indicating estimated fuel economy, and

that a booklet comparing fuel economies of similar vehicles, prepared by the EPA, be made available by vehicle dealerships.  *See* 49 U.S.C. § 32908(b); *see also Gilles v. Ford Motor Co.*, 24 F. Supp. 3d 1039, 1045 (D. Colo. 2014) (identifying the sticker as a "Monroney Sticker"). The Monroney Sticker must also include a disclaimer indicating that "[a]ctual results will vary for many reasons, including driving conditions and how you drive and maintain your vehicle." 40 C.F.R. § 600.302-12(b)(4) (internal quotation marks omitted); *see also Gilles*, 24 F. Supp. 3d at 1045.

The EPA regulates the calculation of estimated fuel economy.  The current regime allows automobile manufacturers to choose between two methods of calculating fuel economy.  A manufacturer can either directly test fuel economy using a "5-cycle" method, or it can derive fuel economy estimates using a series of equations and data from directly-tested, similar vehicles. *See* 40 C.F.R. § 600.210-12; Press Release, EPA Announces Revised Fuel Economy Label Estimates for 2013 Ford C-MAX; Initiates Effort to Update Labeling Procedures to Keep Pace with Industry Trends (Aug. 15, 2013) ("Press Release"), available at http://yosemite.epa.gov/opa/admpress.nsf/6424ac1caa800aab85257359003f5337/8a00bfd7633d5 48f85257bc800637d37!OpenDocument (last visited July 17, 2017) ("EPA label regulations allow, but do not require, vehicles with the same engine, transmission[,] and weight class to use the same fuel economy label value data . . . ."); *see also* 40 C.F.R. § 600.115-11 (providing criteria for using the "derived 5-cycle method").[3]  Ford used the former approach with the Fusion and the latter with the C-MAX.  *See* Press Release ("Ford based the 2013 Ford C-Max label on

---

[3] Of note, manufacturers may also "voluntarily lower fuel economy values . . . if they determine that the label values from any method are not representative of the fuel economy . . . for that model type."  40 C.F.R. § 600.210-12(a).

testing of the related Ford Fusion hybrid, which has the same engine, transmission[,] and test weight as allowed under EPA regulations.").

The FTC, by contrast, regulates the advertisement of fuel economy estimates to consumers. Its regulations provide, in relevant part, that "[n]o manufacturer or dealer shall make any express or implied representation in advertising concerning the fuel economy of any new automobile unless . . . the [EPA] is the source of the 'estimated city mpg' and 'estimated highway mpg' and that the numbers are estimates" and marked as such. 16 C.F.R. § 259.2(a) (footnote omitted); *see also Gilles*, 24 F. Supp. 3d at 1046–47 (describing these regulations and noting that, "[s]imply put, when a manufacturer includes miles per gallon numbers in an advertisement, it must, in a clear and conspicuous manner, include the EPA mileage estimates, state that they are estimates, and indicate that the EPA is the source of the estimates"). The FTC regulations further provide that "[f]uel economy estimates derived from a non-EPA test may be disclosed provided that," inter alia, the EPA estimates have "substantially more prominence than any other estimate." 16 C.F.R. § 259.2(c).[4] Unlike the EPA regulations, the FTC regulations do not require an "actual results will vary disclaimer." *Gilles*, 24 F. Supp. 3d at 1047 (internal quotation marks omitted). If a manufacturer fails to comply, the FTC may take "corrective action . . . under applicable statutory provisions." 16 C.F.R. § 1.5.

B.  Procedural History

1.  Multi-District Litigation

The instant Action, consolidated from 18 lawsuits concerning Ford's advertisement of the fuel economy of the Vehicles, was centralized and consolidated in this Court by recommendation

---

[4] The EPA estimate may have equal prominence to the non-EPA estimate in "radio and television advertisements in which any other estimate is used only in the audio." 16 C.F.R. § 259.2(c).

of the United States Judicial Panel on Multidistrict Litigation (the "Panel").  (*See* Dkt. No. 1.)

The Court was initially assigned *Fellows v. Ford Motor Co.*, No. 13-CV-906, on February 7,

2013, and *Teppich v. Ford Motor Co.*, No. 13-CV-1144, three weeks later, as related.  (*See* Dkt.

No. 18.)  On June 7, 2013, the Panel assigned five other cases from other districts to this Court:

three actions in the Central District of California, one in the District of New Hampshire, and one

in the District of New Mexico.  (*See* Dkt. No. 1.)  On June 18, 2013, by recommendation of the

Panel, several other pending actions were added: one from the District of Arizona, two from the

Southern District of Florida, two from the Northern District of Illinois, one from the District of

Massachusetts, and one from the Eastern District of Pennsylvania.  (*See* Dkt. No. 7.)  On June

21, 2013, by recommendation of the Panel, one pending action from the District of Nevada was

added.  (*See* Dkt. No. 13.)  On July 1, 2013, by recommendation of the Panel, one pending action

from the Western District of Missouri was added.  (*See* Dkt. Nos. 7, 16.)  On August 8, 2013, by

recommendation of the Panel, one pending action from the Western District of Washington was

added.  (*See* Dkt. No. 44.)  On July 29, 2015, by recommendation of the Panel, one pending

action from the Central District of California was added.  (*See* Dkt. No. 81.)

On November 12, 2015, the Court granted in part and denied in part Defendant's first

Motion To Dismiss.  *See Ford I*, 2015 WL 7018369.  Plaintiffs were granted leave to file an

amended pleading within 30 days from the date of *Ford I*.  *See id.* at *40.  Plaintiffs filed the

SAC on December 14, 2015.  (*See* Dkt. No. 84.)  Defendant filed its Motion To Dismiss the SAC

and associated documents on April 1, 2016, (*see* Dkt. Nos. 100–01), Plaintiffs filed their

opposition on May 2, 2016, (*see* Dkt. No. 104), and Defendant filed a reply on June 2, 2016, (*see*

Dkt. No. 105).  On June 28, 2017, the Court heard oral argument on Defendant's Motion.  (*See*

Dkt. (minute entry for June 28, 2017).)

2.  Plaintiffs' Claims[5]

In the following order, Plaintiffs allege several state statutory causes of action, including one each for violations of the California Business & Professions Code § 17200, et seq. (Unfair Competition Law), California Business & Professions Code § 17500, et seq. (False Advertising Laws), and California Civil Code § 1750, et seq. (Consumer Legal Remedies Act), "on [b]ehalf of [a]ll Plaintiffs or, [a]lternatively, the California Plaintiffs"; one cause of action for violations of the Arizona Consumer Fraud Act §§ 44-1521–34 on behalf of the Arizona Plaintiff; one cause of action for violations of the Colorado Revised Statutes § 6-1-101, et seq. (Colorado Consumer Protection Act), on behalf of the Colorado Plaintiff; one cause of action for violations of the Connecticut General Statutes § 42-110a, et seq. (Connecticut Unfair Trade Practices Act), on behalf of the Connecticut Plaintiff; one cause of action for violations of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, et seq., on behalf of the Florida Plaintiffs; one cause of action each for violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, § 815 Illinois Compiled Statutes Annotated 505/1, et seq., and the Illinois Uniform Deceptive Trade Practices Act, § 815 Illinois Compiled Statutes Annotated 510/1, et seq., on behalf of the Illinois Plaintiffs; one cause of action for violations of the Maryland Consumer Protection Act, Md. Code Com. Law § 13-101, et seq., on behalf of the Maryland Plaintiff; one cause of action for violations of the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.901, et seq., on behalf of the Michigan Plaintiffs; one cause of action for violations of the Minnesota Consumer Fraud Act, Minnesota Statutes §§ 325f.68–69, on behalf of the Minnesota Plaintiff; one cause of action for violations of the Missouri Merchandising Practices Act,

---

[5] Each set of state Plaintiffs referred to herein, e.g., "California Plaintiffs," refers to the Plaintiffs whose causes of action accrued in that state.

Missouri Revised Statutes § 407.010, et seq., on behalf of the Missouri Plaintiffs; one cause of action each for deceptive acts and practices in violation of N.Y. Gen. Bus. Law § 349, and false advertising in violation of N.Y. Gen. Bus. Law § 350, et seq., on behalf of the New York Plaintiffs; one cause of action for violations of the Oregon Unlawful Trade Practices Act, Or. Rev. Stat. § 646.607, et seq., on behalf of the Oregon Plaintiff; one cause of action for violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, et seq., on behalf of the Pennsylvania Plaintiff; and one cause of action for violations of the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 110.18, on behalf of the Wisconsin Plaintiff.  (*See* SAC ¶¶ 106–280.)

There are also several common law claims asserted on behalf of all Plaintiffs, though Plaintiffs do not specify upon which jurisdiction's common law they are based.  These claims include one for fraud, one for breach of express warranties, and one for unjust enrichment.  (*See id.* ¶¶ 281–86, 304–14, 324–28.)[6]

As relief from Ford's alleged misconduct, Plaintiffs ask that the sales and leases of the Vehicles be rescinded or reimbursed, that all profits and compensation improperly obtained be disgorged, that Ford cease its false advertising and other unlawful business practices, and that Plaintiffs be awarded damages, including punitive damages, attorneys' fees, interest, and costs of suit.  (*See id.* at 71–72.)

---

[6] Plaintiffs initially asserted claims for negligent misrepresentation, breach of contract, and breach of the covenant of good faith and fair dealing, but have chosen to voluntarily dismiss these claims.  *See Ford I*, 2015 WL 7018369, at *11 n.8.  Plaintiffs also originally asserted a cause of action for violations of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, et seq., but the Court dismissed that cause of action in *Ford I*.  *See id.* at *37.

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and internal quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and internal quotation marks omitted).  Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the

hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

### B.  Analysis

In *Ford I*, the Court largely set the playing field for the standards applicable to Plaintiffs' claims.  First, the Court ruled that all of Plaintiffs' claims were subject to Rule 9(b) of the Federal Rules of Civil Procedure, except for Plaintiffs' New York General Business Law § 349 claim, Oregon Unlawful Trade Practices Act claim, and common law breach of warranty claim. *Ford I*, 2015 WL 7018369, at *19 ("In sum, because the gravamen of the [Consolidated Amended Class Action Complaint] is fraud, the Court concludes that Rule 9(b) applies to all of Plaintiffs' claims except for Plaintiffs' New York law claim, Plaintiffs' Oregon law claim, and two claims for breach of warranty.").  To comply with Rule 9(b), the Court noted that Plaintiffs "do not need to provide the date and time of every allegedly fraudulent statement," but "must identify each and every advertisement Plaintiffs relied upon in order to establish the who[,]

where, when, and why of the fraud." *Id.* at *20–21 (alteration and internal quotation marks omitted).

Second, the Court held that Plaintiffs' claims were partially preempted by the EPCA. *See id.* at *25. The Court specified that

> to the extent that Plaintiffs' claims are premised on the idea that the advertisements . . . included EPA estimates, rather than some other "actual" fuel economy calculation, or to the extent that Plaintiffs' claims are based on the contention that Defendant failed to independently test and disclose the fuel economy of the C-MAX in order to determine its "actual" performance . . . , the Court finds that those claims are preempted by the EPCA and FTC, because they seek to impose a regime above and beyond that required by those regulations.

*Id.* at *27. But, the Court found that Plaintiffs' claims were not preempted to the extent Plaintiffs alleged that the "advertisements functioned to guarantee specific, real-world performance." *Id.* at *26; *see also Yung Kim v. Gen. Motors, LLC*, 99 F. Supp. 3d 1096, 1104 (C.D. Cal. 2015) (finding that statements made in advertisements that "could lead a reasonable consumer to believe that the vehicle [at issue] [was] capable of achieving . . . EPA estimates under real world conditions" not to be preempted); *Sanchez v. Ford Motor Co.*, No. 13-CV-1924, 2014 WL 2218278, at *3–5 (D. Colo. May 29, 2014) (finding claims highlighting "advertisements about the Lincoln MKZ Hybrid beyond the EPA estimate itself," including an alleged suggestion that an MKZ Hybrid "could travel 717 miles on a single tank of gas," not to be preempted).

No Party challenges these rulings in their motion papers. Thus, the Court will apply these same standards to the instant Motion.

### 1. Plaintiffs' Consumer Protection Claims

In *Ford I*, the Court held that certain of Plaintiffs' claims, namely those targeting advertisements that go beyond the mere use of EPA estimates, "state[d] a claim under state

consumer protection law, even under the strict requirements of Rule 9(b)," *Ford I*, 2015 WL 7018369, at *32, because the allegations supporting those claims "describe[d] the nature, timing, and location" of the alleged fraudulent statements in the context of the 2013 marketing campaign, and "ascribe[d] a reasonable motive to Defendant in making those misstatements, namely selling more of the Vehicles," *id.* at *33.  However, the Court determined that it was not clear whether each individual Plaintiff relied upon an advertisement containing actionable statements.  The Court therefore gave Plaintiffs 30 days to file an amended pleading specifically identifying the advertisements upon which each of the Plaintiffs relied.  *See id.* at *34,*40.

The SAC represents Plaintiffs' attempt to comply with the Court's direction in *Ford I*. As described above, Plaintiffs have now specifically identified the advertisements upon which each Plaintiff relied—nine Plaintiffs relied upon the "Freight" commercial, two Plaintiffs relied upon the "Weeee" commercial, four Plaintiffs relied upon the "Hybrid Games" video, nine Plaintiffs relied upon the Fusion Brochure, five Plaintiffs relied upon the Fusion Hybrid Video, three Plaintiffs relied upon the C-MAX Brochure, and two Plaintiffs relied upon the "Wrong Direction" commercial.  The issue, then, is whether these advertisements are actionable, i.e., they contain statements or guarantees of "specific, real-world performance."  *Id.* at *26.

Defendant argues that Plaintiffs' claims must be dismissed because all of the advertisements identified in the SAC contain the federally mandated disclaimers, i.e., "EPA-estimated 47 city/47 hwy/47 combined MPG.  Actual mileage will vary."  (Def.'s Mem. of Law in Supp. of Mot. To Dismiss ("Def.'s Mem.") 5 (Dkt. No. 101).)  The Court has already rejected this argument.  *See Ford I*, 2015 WL 7018369, at *33 ("[The cases Defendant cites] do not stand for the proposition that the inclusion of an EPA-estimate-related disclosure in an advertisement renders the entire advertisement, no matter its content, non-actionable.  Rather, . . . th[e] cases

. . . indicate that specific promises that constitute representations *beyond* EPA estimates and related disclosures *are* actionable."). The Court sees no reason to depart from this ruling.

Defendant argues next that none of the identified advertisements contains statements about the real-world performance of the Vehicles. (*See* Def.'s Mem. 5.) In large part, the Court agrees with Defendant. The "Freight," "Weeee," Fusion Hybrid Video, and "Wrong Direction" commercials do not contain statements concerning the Vehicles' real-world performance. Other than noting that the Vehicles are shown driving around on city streets and highways—a depiction that does not make representations about real-world performance—and that certain of the commercials contain statements that the Vehicles deliver an EPA-estimated 47 MPG—which are not statements about real-world performance—Plaintiffs focus on statements comparing the Vehicles' fuel economy to that of the Prius V and other categories of vehicles. Plaintiffs single out the following statements: (1) in the "Freight" commercial, the narrator states that the C-MAX "beats Prius V with better MPG"; (2) in the "Weeee" commercial, the narrator states that the "C-MAX has lots more horsepower than Prius V, a hybrid that C-MAX also bests in MPG"; (3) in the Fusion Hybrid Video, the narrator states that the Fusion "doubles the fuel economy of the average vehicle"; and (4) in the "Wrong Direction" commercial, the narrator states that the Fusion is "the most fuel efficient midsize hybrid in America." While the Court agrees with Plaintiffs that these statements are not mere puffery, as the statements are capable of verification, *see Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014) (noting that in the securities fraud context "[s]tatements by a company that are capable of objective verification are not 'puffery' and can constitute material misrepresentations"); *Salazar v. Honest Tea, Inc.*, 74 F. Supp. 3d 1304, 1316 (E.D. Cal. 2014) ("[S]pecific factual assertions which could be established or disproved through discovery are not mere puffery because claims of this sort

are capable of objective verification." (alteration and internal quotation marks omitted)); *Spiel Assocs., Inc. v. Gateway Bookbinding Sys., Ltd.*, No. 03-CV-4696, 2010 WL 546746, at *10 (E.D.N.Y. Feb. 16, 2010) ("Puffery is distinguishable from misdescriptions or false representations of specific characteristics of a product." (internal quotation marks omitted)), the statements do not guarantee specific, real-world performance.[7]  Nowhere in these commercials does Ford promise that the C-MAX will achieve better gas mileage than the Prius V or that the Fusion's fuel economy "doubles the fuel economy of the average vehicle" under real-world conditions.  Instead, the commercials rely on the EPA-estimated fuel economy of the Vehicles to make comparisons to other automobiles in the marketplace.  It is evident that Defendant relied

---

[7] Defendant argues that "a statement that the C-MAX has 'better' MPG than another vehicle constitutes non-specific, non-quantifiable, non-actionable puffery."  (Def.'s Mem. 7.) The Court disagrees because the cases Defendant cites are distinguishable.  In none of the cases identified by Defendant did the defendant make a comparison between two products based on a specific and verifiable quality or characteristic.  *See, e.g.*, *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 498–99 (5th Cir. 2000) (holding that the defendant's statement that it had "better pizza" than a competitor was non-actionable puffery); *Icon Health & Fitness, Inc. v. Nautilus Grp., Inc.*, No. 02-CV-109, 2004 WL 6031124, at *23 (D. Utah Dec. 21, 2004) (holding that the statement that consumers get better resistance during a workout from an exercise machine that uses a cable system as opposed to one that uses a rod system was puffery).  In this case, the statements identified by Plaintiffs are about specific and verifiable characteristics of the Vehicles, i.e., they get better MPG than the Prius V and other comparable vehicles.  The MPG of the Vehicles is not a "subjective claim which cannot be proven either true or false, nor is it a vague statement of a product's superiority."  *Kacocha v. Nestle Purina Petcare Co.*, No. 15-CV-5489, 2016 WL 4367991, at *17 (S.D.N.Y. Aug. 12, 2016) (alterations, citation, and internal quotation marks omitted).

During oral argument, Defendant, for the first time, cited an additional case to support its argument that the statements identified above are puffery.  In *Counts v. General Motors, LLC*, — F. Supp. 3d —, 2017 WL 588457, (E.D. Mich. Feb. 14, 2017), the court held that a claim that the defendant's diesel engine generated at least "90% less emissions" was non-actionable puffery because the statement "raise[d] the question: 90% less than what?"  *Id.* at *18 (internal quotation marks omitted).  The Court is not left with similar questions in this Action.  The advertisements specifically state that the Vehicles deliver better MPG than the Prius V, the average vehicle, and midsize hybrids.  Indeed, the *Counts* court noted that the defendant's claim about emissions "ma[de] no verifiable comparison to any identifiable competitor's product."  *Id.* (internal quotation marks omitted).  Accordingly, the Court declines to hold that the statements identified by Plaintiffs are mere puffery.

upon the EPA-estimated fuel economy for the Vehicles in making these comparisons because all of the commercials discussed in this paragraph contain disclaimers alerting viewers to the fact that the figures are "EPA-estimated."  (*See* "Freight" at 26 seconds; "Weeee" at 22 seconds; Fusion Hybrid Video at 25 seconds; "Wrong Direction" at 21 seconds.)  Some of the commercials go even further and specify the source of the information used in the comparison. For example, the narrator's statement that the Fusion's fuel economy "doubles the fuel economy of the average vehicle" in the Fusion Hybrid Video is based upon "a comparison of US EPA's estimated combined fuel economy of Fusion Hybrid (47 mpg) and US Federal Highway Admin[istration] 2010 estimate of average fuel economy of all light duty vehicles (21.6 mpg)." In short, Plaintiffs' challenges to the "Freight," "Weeee," Fusion Hybrid Video, and "Wrong Direction" commercials are not based on guarantees of specific performance, but on the way in which Defendant chose to use the Vehicles' EPA estimates.  To permit Plaintiffs to challenge these statements would be tantamount to permitting Plaintiffs to challenge the EPA estimates themselves.  The Court has already determined that any such claims would be preempted.  *See Ford I*, 2015 WL 7018369, at *25–27.[8]

Furthermore, the statements Plaintiffs identify in these videos are similar to statements that the court in *Yung Kim* found were not actionable under California consumer protection law.

---

[8] To be clear, the Court is not holding that a vehicle manufacturer can utilize EPA estimates in any way that it chooses.  If Defendant utilized the EPA estimates in a false or misleading way, such statements are likely to be actionable under state consumer protection law. *See Ford I*, 2015 WL 7018369, at *28 ("As the *Yung[]Kim* court noted, 'the existence of the federal regulatory scheme does not preclude states from barring the misuse of EPA fuel efficiency data in advertising or other promotional materials,' and 'allowing states to regulate false advertising and unfair business practices may further the goals of the EPCA.'" (quoting *Yung Kim*, 99 F. Supp. 3d at 1105)).  Plaintiffs, however, have not made any such allegations in this case.  For example, Plaintiffs have not alleged that Defendant's statements were false, i.e., that the Prius V's EPA-estimated fuel economy was actually higher than that of the C-MAX.

In *Yung Kim*, the plaintiff identified three alleged misrepresentations that led him to believe that a GMC Terrain would achieve a certain MPG under real-world driving conditions.  *Yung Kim*, 99 F. Supp. 3d at 1099–1100.  The first was a brochure for the Terrain, which stated that the "Terrain 'has the best highway fuel economy in its class at 32 highway miles per gallon' and include[d] a chart with the language 'UP TO 600 HWY Miles.'"  *Id.* at 1099.  Next to the chart was a map outlining a route from Chicago, Illinois to Rochester, New York, which the plaintiff alleged was more than a 600-mile trip.  The brochure also stated that the Terrain could "go up to 600 highway miles on a single tank of gas."  *Id.* at 1100 (internal quotation marks omitted).  The second alleged misrepresentation identified by the plaintiff, also found in the Terrain brochure, stated: "AT 32 HIGHWAY MILES PER GALLON, WE GAVE IT BETTER FUEL ECONOMY THAN ANY SUV OR CROSSOVER," with the words "EPA estimated" in a fine print footnote.  *Id.* (internal quotation marks omitted).  The third claimed misrepresentation, found in the Road & Truck magazine, stated: "32 HWY MPG RATED, AVAILABLE POWER LIFTGATE, SEATING FOR 5 ADULTS.  WE PROBABLY HAD YOU AT 32 MPG," with a disclaimer in a footnote stating "EPA estimate."  *Id.* (internal quotation marks omitted).  The court concluded that only the statements concerning the fact that the Terrain could travel up to 600 miles on a tank of gas were actionable because "claims that rely solely on advertisements that merely repeat the approved EPA mileage estimates, without any additional representations as to, for example, a consumer's ability to achieve those figures under normal driving conditions, must fail."  *Id.* at 1108 (emphasis and internal quotation marks omitted); *see also id.* at 1109 n.2 ("To the extent that [the plaintiff's] claims are premised solely on representations regarding the Terrain's EPA mileage estimates, the [c]ourt finds that they are insufficient . . . .").  Plaintiffs' claims fail for the same reason.  Accordingly, the Court concludes that the "Freight," "Weeee,"

Fusion Hybrid Video, and "Wrong Direction" commercials do not contain statements or representations that are actionable under state consumer protection law.

The same ruling applies with equal force to the statements Plaintiffs have identified in the brochures that they received at automobile dealerships.  With respect to the Fusion Brochure, Plaintiffs single out the section stating:

> 47 mpg in the city and on the highway? Yes, it's true.  Building upon the award-winning success of the 2012 model, the all-new 2013 Fusion Hybrid achieves 47 combined mpg.[1]  City mileage is best in class and 4 mpg more than its nearest class competitor.

(SAC Ex. 4, at 5.)  And in the C-MAX Brochure, Plaintiffs specifically target the section stating:

> ## The all-new C-MAX Hybrid:
> ## Reduced carbon footprint.  Real-car performance.
>
> Introducing the versatile new 5-passenger multi-activity vehicle from Ford: C-MAX Hybrid.  With up to 47 city and 47 hwy mpg.[1]  It's more fuel efficient than Toyota Prius [V].  And that's only the beginning.  When you step on the accelerator, C-MAX Hybrid delivers a truly engaging driving experience.

(SAC Ex. 6, at 2.)  The footnotes referenced in these passages state: "EPA-estimated 47 city/47 hwy/47 combined mpg."  (SAC Ex. 4, at 5 n.1; SAC Ex. 6, at 2 n.1.)  As with the commercials identified above, nothing in these passages promises specific, real-world performance.  Plaintiffs argue that the Fusion Brochure is nonetheless actionable because the brochure states that it is "true" that the Fusion gets "47 mpg in the city and on the highway," (Pls.' Mem. of Law in Opp'n to Def.'s Mot. To Dismiss ("Pls.' Opp'n") 15 (Dkt. No. 104)), but Plaintiffs' argument has no merit.  The Fusion Brochure's representations are based entirely on the Fusion's EPA-estimated MPG, as is evident from the inclusion of the footnote.  Plaintiffs argue also that the C-MAX Brochure is actionable because the brochure includes the heading "Real-car performance." (*Id.* at 18–19.)  The Court again disagrees because the C-MAX Brochure's statements about the fuel efficiency of the C-MAX are based entirely on the EPA-estimated MPG, as is indicated by

27

the footnote, and the brochure's statement about "[r]eal-car performance" is puffery, *see Pelman v. McDonald's Corp*, 237 F. Supp. 2d 512, 528 n.14 (S.D.N.Y. 2003) ("Puffery is defined as exaggerated general statements that make no specific claims on which consumers could rely."). Accordingly, the Court concludes that neither the Fusion Brochure nor the C-MAX Brochure contains statements or representations that are actionable under state consumer protection law.

The Court holds, however, that the Plaintiffs that relied upon the "Hybrid Games" video—Holman, Pitkin, Broome, and Harkins—have stated claims under the relevant state consumer protection laws.  The Court indicated as much in *Ford I*, where the Court stated:

> The best example [of Plaintiffs distinguishing additional representations from the mere use of EPA estimates] is the "Hybrid Games" advertisement, given the purpose of the advertisement is to visually illustrate the impact of the difference in real-world fuel economy between the C-Max and Prius V in the course of regular driving.  In fact, after familiarizing the viewer with the "specs," namely EPA-estimated fuel economy, the narrator indicates that the purpose of the competition between the C-Max and Prius V is to see if the difference in the specs proves true in actual use.  Additionally, while the FTC-mandated disclosure is present in most of the Hybrid [G]ames advertisement (and the other advertisements at issue), Defendant offers no response to Plaintiffs' argument that the use of this disclaimer (i.e., "actual mileage may vary") does not inoculate those representations, as they do not contradict the representation.  The disclaimer is not meant to address any representations regarding how far a C-Max or Fusion (or Prius) driver will go on a tank of gas, thus its presence does not defeat Plaintiffs' claims.

2015 WL 7018369, at *32 (citations omitted).

Defendant argues that the Court should revisit this ruling for two reasons: (1) the Plaintiffs who claim to have relied upon the "Hybrid Games" video have not identified specifically any false statements upon which they relied, and (2) these Plaintiffs have not pleaded any facts about the fuel economy of their vehicles.  (*See* Def.'s Mem. 11–12.)  Defendant's first argument is easily cast aside because the allegedly false statements and impressions are evident throughout the "Hybrid Games" video.  As already noted, the sole purpose of the video is to demonstrate that the C-MAX performs better and is more fuel efficient in real-world driving

28

conditions than the Prius V.  Indeed, the video states that the C-MAX gets 571 miles on a tank of

gas, and shows that, under real-world driving conditions, the C-MAX performs better than the

Prius V.  Plaintiffs have alleged the who (Ford), the where (the internet), the what ("Hybrid

Games" video), the when (during Ford's advertising campaign), and the why (the Prius V

delivers better MPG under real-world driving conditions and the C-MAX does not get 571 miles

on a tank of gas) of the fraud.  *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006)

("We have explained that in order to comply with Rule 9(b), the complaint must: (1) specify the

statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where

and when the statements were made, and (4) explain why the statements were fraudulent."

(internal quotation marks omitted)).

Defendant's second argument is stronger, but falls short at this stage of the proceedings.

Defendant contends that Plaintiffs are required to plead the fuel economy of their C-MAXs in

order to state a claim.  (*See* Def.'s Mem. 11–12.)  Defendant argues that this information is

necessary because Plaintiffs' claims are distinct from "straightforward" false advertising cases,

"such as where a consumer purchased a can of diet soda after viewing an advertisement stating

the soda was 'sugar free' when it was made with 5 grams of sugar."  (*Id.*)  In response, Plaintiffs

argue that Defendant is misstating the nature of the injury alleged in the SAC because the injury

"is not dependent on the particular circumstances of each Plaintiff's driving conditions or styles."

(Pls.' Opp'n 14.)

Under Plaintiffs' theory, "Plaintiffs were injured at the moment they purchased their

hybrids" because Defendant falsely advertised the Vehicles' MPG and was able to over-price the

Vehicles based on those misrepresentations.  (*Id.*)  Plaintiffs will ultimately have to demonstrate

that the statements contained in the "Hybrid Games" video are false and a causal connection

between the falsehood and Plaintiffs' injuries, *see Owen v. Gen. Motors Corp.*, 533 F.3d 913, 922 (8th Cir. 2008) ("Although the [Missouri Merchandising Practices Act ('MMPA')] does not sound in tort and does not require a showing of a product defect as a matter of course, the plain language of the MMPA demands a causal connection between the ascertainable loss and the unfair or deceptive merchandising practice."); *Pirozzi v. Apple, Inc.*, 966 F. Supp. 2d 909, 920 (N.D. Cal. 2013) ("[T]o plead fraud under the [California Unfair Competition Law]," a plaintiff must allege, inter alia, "a causal connection or reliance on the alleged misrepresentation." (internal quotation marks omitted)); *Grice Eng'g, Inc. v. JG Innovations, Inc.*, 691 F. Supp. 2d 915, 922 (W.D. Wis. 2010) ("Wisconsin courts divide a claim under [the Wisconsin Deceptive Trade Practices Act] into three elements: (1) the defendant made a representation to the public with the intent to induce an obligation: (2) the representation was untrue, deceptive or misleading: and (3) the representation materially caused a pecuniary loss to the plaintiff." (internal quotation marks omitted)); *Kuehn v. Stanley*, 91 P.3d 346, 351 (Ariz. Ct. App. 2004) ("To succeed on a claim of consumer fraud [under the Arizona Consumer Fraud Act], a plaintiff must show a false promise or misrepresentation made in connection with the sale or advertisement of merchandise and consequent and proximate injury resulting from the promise."), but, at this stage, Plaintiffs need only *allege* that the video contained false statements and that those falsehoods caused an injury.  Plaintiffs have done exactly that in the SAC.  To the extent that Plaintiffs' claims are based upon a comparison between the fuel economy of the C-MAX and the Prius V, the "Hybrid Games" video's explicit purpose is to compare the fuel economy of the Prius V to the C-MAX under real-world conditions.  Plaintiffs specifically allege that the fuel economy comparison was false because the "Prius actually achieves better MPG than the C-MAX in real-world driving conditions."  (SAC ¶ 79.)  Plaintiffs allegedly were

30

injured by the comparison because Plaintiffs overpaid for the vehicles they purchased and incurred fuel costs in excess of what they anticipated, (*id.* ¶ 97), and would not have purchased or leased a C-MAX but for Defendant's misstatements, (*id.* ¶ 8).  A fair inference that can be drawn from these allegations is that the Prius V delivers better MPG than Plaintiffs' vehicles under real-world driving conditions, and therefore the "Hybrid Games" video falsely advertises the C-MAX's expected performance.[9]  To the extent that Plaintiffs' claims are based on the statement in the "Hybrid Games" video that the C-MAX can go 571 miles on a tank of gas, Plaintiffs have sufficiently alleged that this statement is false, (*see id.* ¶¶ 73, 79), and that it injured Plaintiffs in the amount of additional fuel costs, (*id.* ¶ 97).  Again, the Court can fairly infer from Plaintiffs' allegations that Plaintiffs' vehicles cannot go 571 miles on a tank of gas. The Court notes, however, that nothing in the "Hybrid Games" video guarantees that the C-MAX will get 47 MPG under real-world driving conditions.  The video is thus actionable only to the extent that it makes false statements about how the C-MAX's fuel economy differs from that of the Prius V under real-world driving conditions and how far the C-MAX can go on a tank of gas.

In sum, the consumer protection law claims that are based on the "Freight," "Weeee," Fusion Brochure, Fusion Hybrid Video, C-MAX Brochure, and "Wrong Direction" advertisements are dismissed with prejudice.  However, Plaintiffs whose claims are based on the "Hybrid Games" video—Holman, Pitkin, Broome, and Harkins—have stated adequately a claim under the relevant state consumer protection laws.

---

[9] An argument that permeates Defendant's papers is that Plaintiffs cannot state a claim because the fuel economy of a vehicle varies based on several factors, such as driving style, climate, and traffic patterns.  (*See* Def.'s Mem. 12.)  This argument raises more questions than it answers.  If fuel economy is not "one size fits all," as Defendant contends, why did Defendant create an advertisement explicitly declaring that the C-MAX delivers better fuel economy than the Prius V under real-world driving conditions?

### 2.  Common Law Fraud

In *Ford I*, the Court held that Plaintiffs' common law fraud claim survived Defendant's first Motion To Dismiss.  2015 WL 7018369, at *35.  The Court noted that Plaintiffs "included adequate allegations as to *some* advertisements with the requisite specificity under Rule 9(b)" to state a fraud claim.  *Id.* (emphasis added).  The Court did not, however, specifically identify which advertisements were actionable.  Now that Plaintiffs have identified the advertisements upon which each Plaintiff relied, the Court concludes that the "Freight," "Weeee," Fusion Brochure, Fusion Hybrid Video, C-MAX Brochure, and "Wrong Direction" advertisements are not actionable for the same reasons stated above—nothing in these advertisements guarantee or promise specific, real-world performance.  But, also for the same reasons as stated above, the fraud claim may proceed as it pertains to the "Hybrid Games" video.

### 3.  Breach of Express Warranty

In *Ford I*, the Court denied Defendant's first Motion To Dismiss Plaintiffs' breach of express warranty claim and noted that "[g]uarantees beyond a mere disclosure" of EPA estimates "may . . . create" an express warranty.  *Id.* at *36 (emphasis omitted).  As has been discussed at length, the only advertisement containing actionable statements is the "Hybrid Games" video. Accordingly, Plaintiffs' breach of express warranty claim is dismissed insofar as it is based on the other advertisements attached to the SAC.

The Parties disagree on whether this is where the Court's analysis should end.  Defendant argues that the only "statements that should be considered when evaluating the sufficiency of Plaintiffs' breach of express warranty claims are those identified as Exhibits 1 through 7 in the SAC."  (Def.'s Mem. 19.)  Plaintiffs initially appear to agree with Defendant's contention, but then argue that they need fact discovery to determine whether Defendant disseminated additional

advertisements to other potential Class members.  (*See* Pls.' Opp'n 23.)  The Court is confused

by this request.  Plaintiffs seemingly want discovery to determine whether Defendant

disseminated advertisements other than those identified in the SAC to potential plaintiffs not

named in the SAC.  The basis for Plaintiffs' argument is that express warranty claims do not

require reliance.  (*Id.* (citing *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 411–12 (S.D.N.Y.

2015)).)  Defendant, however, is not arguing that Plaintiffs must plead reliance to defeat the

Motion To Dismiss.  Instead, Defendant argues that Plaintiffs are not entitled to fact discovery to

identify other potentially actionable statements when the Plaintiffs named in the SAC have

identified the statements that were disseminated to them.  (*See id.* at 24 (noting that the named

Plaintiffs "have identified specific advertisements that they saw and which were disseminated to

them" (emphasis omitted)).  The Court agrees with Defendant.  The Plaintiffs named in the SAC

do not have standing to assert a cause of action on behalf of some unidentified group of

individuals who may have viewed advertisements not identified in the SAC that may or may not

contain actionable statements.  *See Vaccariello v. XM Satellite Radio, Inc.*, 295 F.R.D. 62, 68

(S.D.N.Y. 2013) ("[T]he named plaintiff must allege and show that they personally have been

injured, not that injury has been suffered by other, unidentified members of the class to which

they belong and which they purport to represent." (internal quotation marks omitted)); *In re

Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 754

F. Supp. 2d 1145, 1183 (C.D. Cal. 2010) ("California law does not permit [p]laintiffs, in the

absence of specific allegations that they were aware of the statements made in a national

advertising campaign, to base their express warranty claims on statements made in that national

advertising campaign.").  Accordingly, Plaintiffs' breach of express warranty claim, to the extent

that it is based on statements not identified in the SAC that were made to putative Class members not identified in the SAC, is dismissed with prejudice.

Finally, Defendant argues that Plaintiffs' breach of express warranty claim must be dismissed because certain Plaintiffs, including Plaintiff Broome, who relied upon the "Hybrid Games" video, did not plead that they provided pre-suit notice of the alleged nonconformity. (*See* Def.'s Mem. 21.)  Here, the Court discusses only Broome's claim because the claims of the other Plaintiffs identified by Defendant are dismissed for the reasons stated above.

"Under Missouri law, a buyer must show that he 'notified the seller of the nonconformity' in order to assert an express warranty claim."  *Patterson Oil Co. v. Verifone, Inc.*, No. 15-CV-4089, 2015 WL 6149594, at *3 (W.D. Mo. Oct. 19, 2015) (quoting *Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 122 (Mo. 2010)).  Plaintiffs allege that "[a]ll conditions precedent to [Defendant's] liability under this express contract, *including notice*, have been performed by Plaintiffs and the [C]lass as described above."  (SAC ¶ 314 (emphasis added).)  Defendant takes issue with this allegation because it does not provide "factual allegations sufficient to establish pre-suit notice," (Def.'s Reply Mem. of Law in Supp. of Mot. To Dismiss 10 (Dkt. No. 105) (emphasis and internal quotation marks omitted)), but the case Defendant relies on to make this argument demonstrates that Plaintiffs' allegation is sufficient.  In *In re Rust-Oleum Restore Marketing, Sales Practices & Products Liability Litigation*, 155 F. Supp. 3d 772 (N.D. Ill. 2016), the court concluded that the law "mandates [that] a complaint provide factual allegations sufficient to establish pre-suit notice to sustain a breach of warranty claim."  *Id.* at 799.  The court then went on to conclude that the following barebones allegations were sufficient to allege that pre-suit notice had been given: (1) the allegation that "once [the] [p]laintiffs purchased [the product at issue] and incurred damages,

34

[the] [p]laintiffs promptly notified [the] [d]efendant of [the product's] premature failure and filed th[e] action," and (2) the allegation that certain plaintiffs "notified [the] [d]efendant that [the product] was prematurely failing and resulting in permanent damages to the deck." *Id.* at 800 (alteration and internal quotation marks omitted).  In this case, Plaintiffs allege that they provided pre-suit notice to Defendant.  (*See* SAC ¶ 314.)  Nothing more is required at this stage.  Accordingly, the Court declines to dismiss Plaintiffs' breach of express warranty claim on this basis.

In sum, Plaintiffs' breach of express warranty claim survives to the extent that it is based on the "Hybrid Games" video.  This claim is otherwise dismissed with prejudice.

### 4.  Unjust Enrichment

In *Ford I*, the Court dismissed Plaintiffs' unjust enrichment claims under California and New York law, but held that Plaintiffs' other state common-law unjust enrichment claims survived for the time being.  *See* 2015 WL 7018369, at *38–39.  Defendant now challenges the remainder of Plaintiffs' unjust enrichment claims.

First, Defendant contends that Plaintiffs' claims lack the factual specificity required by Rule 9(b).  (*See* Def.'s Mem. 23.)  The Court finds no merit in this argument.  Although many of the advertisements Plaintiffs identify are not actionable, Plaintiffs have satisfied Rule 9(b) with respect to the "Hybrid Games" video, the only actionable advertisement.  The SAC states that Defendant was enriched, (*see* SAC ¶ 325 ("[Defendant] generated millions of dollars of revenue from the unlawful conduct described [herein]")), at Plaintiffs' expense because the C-MAX did not deliver on the guarantees made in the "Hybrid Games" video, (*see id.* ¶ 79), and that Defendant should not be permitted to keep the money it generated because it was obtained through fraudulent means, (*see id.* ¶ 327).

Defendant next challenges Plaintiffs' unjust enrichment claims based on the Plaintiffs' states of residence.  The Plaintiffs that relied upon the "Hybrid Games" video reside in Arizona (Holman), California (Pitkin), Missouri (Broome), and Wisconsin (Harkins).  The Court only addresses Defendant's arguments as they pertain to Arizona and Missouri because the Court determined in *Ford I* that "Plaintiffs cannot maintain a cause of action under California law for unjust enrichment," 2015 WL 7018369, at *38, Plaintiffs have not identified any other actionable statements relied upon by Plaintiffs residing in other states, and Defendant does not specifically argue that Plaintiffs cannot maintain a claim for unjust enrichment under Wisconsin law.

Defendant argues that Plaintiffs cannot state an unjust enrichment claim under Arizona law because a plaintiff cannot assert an unjust enrichment claim when he or she has asserted an adequate remedy at law, and Plaintiffs have not alleged that Defendant directly benefitted from the allegedly fraudulent conduct.  Plaintiffs do not address Defendant's first contention, likely because Arizona law rests squarely on Defendant's side.  Under Arizona law, "[a]n unjust enrichment claim requires proof of five elements: (1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and impoverishment, (4) the absence of justification for the enrichment and impoverishment, and (5) *the absence of a remedy provided by law*."  *Wang Elec., Inc. v. Smoke Tree Resort, LLC*, 283 P.3d 45, 49 (Ariz. Ct. App. 2012) (emphasis added) (internal quotation marks omitted).  Because Plaintiffs have asserted other causes of action under Arizona law in the SAC, Plaintiffs cannot maintain an action for unjust enrichment under Arizona law.  Nor do Plaintiffs respond to Defendant's contention that because Defendant did not directly benefit from the allegedly fraudulent advertising, Plaintiffs cannot assert an unjust enrichment claim under Arizona law.  The Court, however, disagrees with Defendant's interpretation of the case law.  Defendant has cited a single case in support of its argument: *Yee*

36

*v. National Gypsum Co.*, No. 09-CV-8189, 2010 WL 2572976 (D. Ariz. June 22, 2010).  *Yee*

held only that the plaintiff could not maintain an unjust enrichment claim against a manufacturer

because the complaint did not *allege* that the plaintiff conferred a benefit on the manufacturer.

*See id.* at \*4.  In other words, *Yee* does not foreclose the possibility that the plaintiff's unjust

enrichment claim would have survived if he pleaded a benefit to the manufacturer.  *Yee* is

inapplicable here because Plaintiffs have *alleged* that Defendant benefitted from the misleading

advertisements through an increase in vehicle sales and revenue.  (*See* SAC ¶¶ 47, 325.)

Nevertheless, Plaintiffs cannot maintain an unjust enrichment claim premised on Arizona law

because they have alleged adequate remedies at law.  *See Wang Elec.*, 283 P.3d at 49; *Loiselle v.*

*Cosas Mgmt. Grp., LLC*, 228 P.3d 943, 947 (Ariz. Ct. App. 2010) ("We agree that, to bring a

successful unjust enrichment claim, a party must show the absence of any remedy at law."

(internal quotation marks omitted)).

    Defendant attacks Plaintiffs' Missouri unjust enrichment claim on the basis that Plaintiffs

have asserted an adequate remedy at law.  (*See* Def.'s Mem. 24, 26.)  One Missouri court has

permitted a plaintiff to plead an unjust enrichment claim in the alternative to a breach of contract

claim.  *See Howard v. Turnbull*, 258 S.W.3d 73, 76 (Mo. Ct. App. 2008) ("[T]he fact that [the

plaintiff] also alleged that the [defendants] breached an agreement entitling him to repayment of

the full amount does not preclude [the plaintiff] from claiming in the alternative the [defendants]

were unjustly enriched.").  More recently, however, that same court held that "if [a] plaintiff has

entered into an express contract for the very subject matter for which he seeks recovery, unjust

enrichment does not apply, for the plaintiff's rights are limited to the express terms of the

contract."  *Howard v. Turnbull*, 316 S.W.3d 431, 436 (Mo. Ct. App. 2010); *see also Patterson*

*Oil*, 2015 WL 6149594, at \*9 ("An unjust enrichment claim is unavailable when the alleged

benefit conferred is the subject matter of a contract."); *Lowe v. Hill*, 430 S.W.3d 346, 349 (Mo. Ct. App. 2014) ("[A] plaintiff cannot recover under an equitable theory when she has entered into an express contract for the very subject matter for which she seeks to recover."). In *Patterson Oil*, the court explained that a plaintiff is entitled to plead claims in the alternative, but when an unjust enrichment claim is based in part on a warranty, "the unjust enrichment claim arises out of the express warranty contract and must be dismissed." 2015 WL 6149594, at *9. Given that the recent trend suggests that Missouri courts are inclined to dismiss unjust enrichment claims when the claims arise out of an express warranty contract, and Plaintiffs have asserted a breach of express warranty claim based on the same conduct giving rise to the unjust enrichment claim, (*see* SAC ¶ 306 ("Plaintiffs and Class members formed contracts with Ford at the time Plaintiffs and Class members purchased or leased their Vehicles.")), the Court holds that Plaintiffs cannot assert an unjust enrichment claim under Missouri law.

Accordingly, except to the extent Plaintiffs' claims are premised on Wisconsin law, Plaintiffs' unjust enrichment claims are dismissed with prejudice.

### C.  Cases Remaining

Presently, there are 18 cases on the Court's docket relating to this Action. Some of the cases on the Court's docket pertain to Plaintiffs who are not mentioned in the SAC. These cases were brought by Naomi Teppich, et al. (No. 13-CV-1144), Sandra Wright, et al. (No. 13-CV-4099), Susan Pliner (No. 13-CV-4101), Pedro Magana (No. 13-CV-4150), Lori Schneider, et al. (No. 13-CV-4235), Marianne Cibeu (No. 13-CV-4236), William Huff, et al. (No. 13-CV-4237), Douglas McVay (No. 13-CV-4243), Michael Tannhauser (No. 13-CV-4316), Angela Boykin (No. 13-CV-4318), Michael McComas (No. 13-CV-4611), Stephen Brand (No. 13-CV-4612), Kelly Wolverton (No. 13-CV-5556), and Dave DeLuca (No. 15-CV-6107). Because these

Plaintiffs are not discussed in the SAC, they do not have any claims before this Court. Accordingly, the Clerk of Court is directed to close these cases.

Then there are the cases for Plaintiffs Robert Fellows (No. 13-CV-906) and James Oldcorn (No. 13-CV-4242), who were named in the SAC, but have not stated a claim because they did not rely on advertisements containing statements about the Vehicles' specific, real-world performance. Accordingly, the Clerk of Court is directed to close these cases.

That leaves two cases: Richard Pitkin, et al. (No. 13-CV-4102), and Nathan Montijo, et al. (No. 13-CV-4152). These cases shall remain active because some of the Plaintiffs identified therein relied upon the "Hybrid Games" video, i.e., Richard Pitkin, Dennis Harkins, and Gregory Holman.

Some of the Plaintiffs identified in the SAC are not associated with any independent action. They are James DeVito, Dean Wilkins, Matthew Romak, Leah Broome, James Griffiths, and Michael Hendrickson. Only the claims asserted by Plaintiff Broome are actionable. Accordingly, the Clerk of Court is directed to dismiss all of the Plaintiffs from this Action, except for Richard Pitkin, Dennis Harkins, Gregory Holman, and Leah Broome.

### III. Conclusion

For the foregoing reasons, Defendant's Motion To Dismiss is granted in part and denied in part. Defendant is directed to file an Answer to the SAC within 20 days from the date of this Opinion. The Clerk of Court is respectfully directed to close case numbers 13-CV-906, 13-CV-1144, 13-CV-4099, 13-CV-4101, 13-CV-4150, 13-CV-4235, 13-CV-4236, 13-CV-4237, 13-CV-4242, 13-CV-4243, 13-CV-4316, 13-CV-4318, 13-CV-4611, 13-CV-4612, 13-CV-5556, and 15-CV-6107, terminate the pending Motion (Dkt. No. 100), and dismiss all Plaintiffs, except for Richard Pitkin, Dennis Harkins, Gregory Holman, and Leah Broome.

DATED:     July **24**, 2017
              White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

40